MATTER OF COOK. 171

Misc. 171]     Surrogate's Court, New York County, February, 1928.

In·the Matter of the Estate of MARION H. COOK, Deceased.

Surrogate's Court, New York County, February 27, 1928.

**Wills — decedent unable to talk or write because of paralytic stroke — proof neither establishes due execution of instrument under Decedent Estate Law, § 21, nor testamentary capacity — fact that paper was signed at end and contained attestation clause does not create presumption of due execution — probate denied.**

The probate of decedent's will must be denied, for the failure to establish due execution under section 21 of the Decedent Estate Law, and testamentary capacity of decedent, where it appears that within an hour after decedent had suffered a paralytic stroke the instrument in question was read to her and the only communication between her and those present was by the use of her head alone, either up or down or from one side to the other, and the pressure of her hand, to denote " yes " or " no " so that in all the thirty or forty minutes consumed in the attempted execution of the paper decedent was unable to talk and unable to write.

Under the circumstances, the movements of the head up and down to express " yes," and from side to side to express " no,'' were not a sufficient compliance with section 21 of the Decedent Estate Law.

The presumption as to the validity of the will, arising from the fact that the attestation clause was signed, cannot be applied, in the absence of proof showing due execution.

Furthermore, testamentary capacity was not established, where the evidence shows that decedent had no knowledge of the nature and extent of her properties, the nature and extent of the act she was performing, the names and identities of those who would be the natural objects of her bounty, and her relations to them.

PROCEEDING for probate of will.

*Orlando P. Metcalf,* for the petitioner.

*James P. Collins,* for the appellant.

*Frank H. Richmond,* special guardian.

*Frank A. Crowe,* of counsel.

O'BRIEN, S. This will contest was tried without a jury. From the testimony offered it appears that decedent on *June 23, 1927,* was a patient in the Carlsbad Baths, No. 209 West Thirty-fourth street, Manhattan, where the proprietor, Henry Zinsser (husband of one of the subscribing witnesses), carried on the business of " hypertherapy and electro-therapy;" *on the morning of June twenty-ninth,* at about eight o'clock, decedent suffered a paralytic stroke; she did not speak; she did not reply when spoken to; she gave no sign of recognition; her breathing was heavy and noisy. She was put in a hot salt bath, blankets wrung out of hot salt water; the wrapping extending from her neck to her feet. At nine o'clock on the same morning a lawyer called at the apartment or baths and at the same time there arrived one Catherine Bradley

(residuary legatee and chief beneficiary named in the propounded paper, and a beneficiary to a much smaller extent in a prior will of decedent, and not a relative of decedent). They entered the room where decedent lay in bed; the attorney had brought a will drawn in accordance with directions given to him by said Mrs. Bradley. He conversed with the patient with respect to the paper which he had drawn; during the whole of the colloquy which ensued and which embodies most of proponent's direct proof in support of the request for probate, decedent "never spoke." All of the communications between her and those present were by the use of the head alone either up and down or from one side to the other, with the exception of a pressure of the hand of Mrs. Zinsser after a question had been put to her, and with the further exception of certain motions said to have been made after the execution of the alleged paper and in connection with the taking of money from a drawer to compensate the attorney. The nods up and down were interpreted by the attorney to mean "Yes" and from side to side to mean "No." The direct case presented by the proponent consisted of the testimony of the two subscribing witnesses, said attorney, James P. Collins, and said wife of the proprietor of the baths, Margaret Zinsser. The former testified to the conversation he had with decedent after he and Mrs. Bradley entered the room, concerning how he had prepared her will in accordance with the *directions from Mrs. Bradley*, how it differed from a prior will drawn by the witness, which he had with him, and what changes he had made. Moreover, he testified that he then read the will to her, explaining further changes made, and continued reading, "stopping after each clause and asking her if that was all right and she indicating by nodding her head up and down." He continued to testify as follows: "I finished reading the will to her and I asked her if there was any other change that she desired made, and she shook her head from left to right." After further testimony he continued: "When I finished I asked her if that was all right. She indicated by moving her head up and down." At and during the period covered by this testimony *the only persons in the room with the patient were such attorney and Mrs. Bradley.* He continued: "I then told Mrs. Bradley, who was in the room that we required another witness to the will, and I asked her if she could get somebody; she went outside; when she was outside I had the will open at the last page, and Mrs. Cook raised her left hand to take this paper from me and had it in front of her. Mrs. Bradley returned in a minute or less with Mrs. Zinsser. She introduced me to Mrs. Zinsser * * * and Mrs. Zinsser then put the glasses on Mrs. Cook * * *. Then Mrs. Cook handed the paper back to me

and I asked her if she wanted me to read it again, and she shook her head from left to right. Then I wrote Marion H. Cook on the paper and the words ' Her mark,' and I put the paper in front of her and asked her to put her hand on the pen   *   *   *. Then I asked her if she could write and she shook her head from left to right, and then she put her hand on the pen and the cross was made, her hand and my hand being on the pen at the time, and I asked her if that was her signature and she said it was   *   *   *   by a shake of the head." He then testified to having asked her the usual and necessary questions to elicit from her the statements, declarations and request in compliance with the statutes, all of the answers being given by nods of the head. Then he testified to the reading of the attestation clause by him to Mrs. Zinsser, to her having signed the paper in both places and to his having signed it in both places. He testified, in answer to a question as to any communications between Mrs. Cook and Mrs. Zinsser prior to the signature of that will: " I said to Mrs. Zinsser Will you ask Mrs. Cook whether or not she desires you to be a witness to the will? She asked Mrs. Cook if she desired her to be a witness to the will and if so to squeeze her hand, and she took Mrs. Cook's hand." He testified that Mrs. Cook " squeezed her hand, I could see the movement." (Mrs. Zinsser's description of that incident will be referred to later.) The balance of the witness' testimony relates to a little incident that happened " after Mrs. Zinsser left the room," wherein communications were had between the attorney and the patient with reference to his compensation for the drawing and execution of the paper. As above noted, the only other direct testimony in behalf of the proponent was that of Margaret Zinsser, wife of the proprietor of the baths, who had been hurriedly called in as a witness by Mrs. Bradley. While this witness admitted her signature at the end of the will and at the end of the attestation clause she contradicted several vital statements contained in said clause. Part of her testimony ran as follows: " Q. Did you see that morning these words ' Marion H. Cook, her mark,' made at that time. A. I don't remember seeing them. Q. At the time you signed your name there were these words ' Marion H. Cook, her mark,' on that instrument? A. I don't remember them being there. Q. At the time you signed this instrument did Marion H. Cook declare this instrument now shown to you to be her last will and testament? A. She could not speak. Q. Did she declare it to be her last will and testament in any form? A. I can't say that she did. Q. You cannot say that she did? A. No. Q. Was this mark and these words made on this will in your presence? A. I don't really remember seeing them made. Q. At the time of the making of this mark

Surrogate's Court, New York County, February, 1928.      [Vol. 132

on this paper and at the time of your signing this instrument, did Marion H. Cook declare this instrument to be her last will and testament? A. No, not in my hearing. She could not speak. Q. Did she declare it in any other way? A. Not so one would understand. Q. Any way by indication? A. I couldn't say that. Q. At the time of the making and execution of this instrument was Marion H. Cook, the testatrix therein named, of sound mind? A. I cannot say that. She had a stroke an hour before or an hour and a half before, probably. Q. Would you say she was of sound mind? A. No, I would not say so. Q. At the time of the execution of this instrument and at the time you signed it was Marion H. Cook under restraint or subject to any influence whatever? A. Not that I know of. Q. You did sign that clause at the bottom of that instrument which is referred to and called the attestation clause; is that right? A. Yes. Q. You did sign it? A. Yes. Q. Will you read that clause (witness reads aloud the attestation clause). Q. When did you see Mrs. Cook, and how did you come into the room at the time you signed your name to that instrument? A. Mrs. Bradley came out into the hall hurriedly and called me to come and witness a will. Q. And you went with Mrs. Bradley, where? A. To this bedroom where Mrs. Cook was lying. Q. Whom did you see in the room at that time? A. Mr. Collins and Mrs. Bradley. Q. What transpired then, to your knowledge? A. Mrs. Bradley said they wanted to witness this will. Q. Did you see that paper there in that room at that time? A. A paper similar to that was there. It must be that paper. My name is on it? Q. You signed the paper that you saw there at that time? A. Yes. Q. That is the only paper you did sign that morning? A. Yes. Q. It was that paper, wasn't it? A. Yes. Q. What was said to you that caused you to sign that paper? A. Mrs. Bradley said: this is the will; it is the same but for the children; the same but for the children; saying that to Mrs. Cook. Q. Did you hear Mr. Collins say anything then? A. They just asked me to witness that will and in a hurry I went in there. I was not noticing everything. The woman had had a stroke. Q. You witnessed it? A. They asked me to witness it. Q. Do you remember they asked you to witness a will? A. Yes. Q. What did Mr. Collins say to you, if anything, or say to Mrs. Cook in your presence? A. Well, I cannot remember just in the words exactly. They wanted to witness this will and sign this will. Q. Did you hear Mr. Collins testify on the stand? A. Yes. Q. Did you hear Mr. Collins testify that he asked Mrs. Cook if she could write? A. Yes. Q. Did you hear that? A. Yes. Q. Did you hear Mr. Collins ask that of Mrs. Cook? A. No. He said — (interrupted). Q. Did you hear Mr.

Misc. 171]    Surrogate's Court, New York County, February, 1928.

Collins ask that question of Mrs. Cook, whether she could write? A. Yes.   Q. Did Mrs. Cook make any indication whether she could write or not?   A. No.   Q. Did Mrs. Cook move up or down her head, or from side to side, just as you have done this minute?   A. I don't say that.   Q. You say you do not recollect that that mark was made there at that time?   You don't recollect seeing it made? A. No.   Q. You won't say it was not made, will you?   A. I won't say it was not made, but I did not see it made.   Q. But you did sign that instrument and say it was signed by Mrs. Cook, didn't you, at that time?   A. I signed the paper.   Q. Did you hear Mr. Collins ask Mrs. Cook whether she declared this paper to be her last will and testament, and did you see any sign of recognition from her at that time, any sign of assent from her at that time by bowing of her head up and down?   A. No.   Q. Will you say she did not?   A. She did not move her head to me.   Q. Will you say in answer to Mr. Collins' question she did not move her head? A. I can't say that.   Q. Did you hear Mr. Collins ask Mrs. Cook at that time whether she wanted him and you to act as witnesses to that will?   A. Yes.   Q. You did hear him ask her that?   A. Yes. Q. Did you see any sign of assent to that?   A. No.   Q. But you stated in your signature to that attestation clause that she asked you, did you not?   A. Mr. Collins asked me — (interrupted). Q. You state in that attestation clause that she requested you, do you not?   A. She did not ask me.   She could not speak.   A. Did you hear Mr. Collins ask her if she wanted you — you say you did hear Mr. Collins ask her if she wanted you and him to sign as witnesses?   A. Yes.   Q. And you then signed that statement that at that time she did request you; is that right?   A. Yes.   Q. You did sign that then?   A. Yes.   That was signed just at that time. They told me the will is all right.   Mr. Crowe: I ask that answer be stricken out as not responsive.   The Surrogate: Strike it out. Q. At the time that request was made or the question was asked Mrs. Cook if she desired you and Mr. Collins to act as witnesses, do you remember Mr. Collins asking you to ask Mrs. Cook whether she wanted you to sign as a witness?   A. Yes.   Q. Did you ask Mrs. Cook?   A. Yes.   Q. Did you tell her to press your hand if she wanted you to sign as a witness?   A. Yes.   Q. Did she press your hand?   A. I took her hand.   There was some voluntary motion there.   Q. Did you feel her press your hand, some motion on your hand in response to your question?   A. I couldn't say whether it was just ordinary.   Q. Slight pressure?   A. I held her hand.   Q. Did she exert a slight pressure on your hand?   A. She took it as such.   I don't know.   Q. That was in response to a question, if you wish me to sign this will as a witness, press my hand?

Surrogate's Court, New York County, February, 1928.          [Vol. 132

A. Yes. Q. You think she understood that, don't you? A. That I can't say. Q. Did not you get that response? A. I can't say that now. Q. You had a pressure on your hand from her. A. I thought so. Q. And that was in response to your question, ' Do you want me to sign this will as a witness? ' A. I asked that question."

The cross-examination of the witness Margaret Zinsser was largely taken up in a description of the condition of the decedent upon the morning of the stroke and the execution of the alleged will, a description of the bedclothes, the calling of the doctor, Cora M. Ballard, and carrying out of the doctor's directions. Proponent then rested.

The contestant moved that the will be refused probate upon the grounds which were set forth and the court reserved decision upon said motion.

The contestants then called as witnesses Dr. Cora M. Ballard, whose testimony was excluded upon objection based upon her interest under a prior will in the estate of decedent; Mrs. E. S. Marmion, a registered nurse who attended the decedent after she was taken from the Carlsbad baths to her home. I have disregarded her testimony as well as that of John Schimp, the driver of the ambulance who conveyed decedent from the baths, because their testimony related to a time after the alleged execution of the paper. The other witnesses called by the contestants were Mary Wallace and Agnes O'Brien, who were witnesses to the prior will, Edwin J. Hovey, a first cousin of decedent, who among other things testified that Catherine Bradley was not related to decedent, that Hovey Cook, referred to in the testimony of Henry Zinsser, was a grandson of decedent, and as to certain other relatives of decedent. Dr. James L. Jouhin, called as an expert in nervous and mental diseases and who, in answer to a hypothetical question, which concluded, " could you say with reasonable certainty whether between nine and nine forty on the same morning such a woman had sufficient strength and clearness of mind and memory to know in general the nature and extent of the property of which she was about to dispose, and the nature of the act she was about to perform, the names and identity of the persons who were the proper objects of her bounty, and her relations to them? " that " she could not " in his opinion; and Henry Zinsser, the proprietor of the baths, who described the condition of the patient upon the morning of June 29, 1927, and who in his testimony upon other subjects stated that when decedent came he took a record of her " and in case she got seriously ill, who to call up " and that she gave him the names of Hovey Cook (a grandson of decedent) and her lawyer, Mr. Hamilton McInness.

Misc. 171]    Surrogate's Court, New York County, February, 1928.

In rebuttal the proponent called Catherine Bradley and Attorney Collins who testified to certain matters of minor importance.

Considering in the first instance contestants' motion made at the close of the proponent's case, the question immediately arises: " Did the proponent sustain the burden of proof resting upon him with respect to (1) the due execution of the instrument under the requirements of the statute, and (2) the testamentary capacity of decedent? Does the testimony of Attorney Collins and Mrs. Zinsser sustain that burden? Collins asserts that each detail of the requirements of section 21 of the Decedent Estate Law was complied with, explaining that compliance so far as testatrix was concerned was not oral nor literal, but by movements of the head, up and down to express " Yes " and from side to side to express " No." In this connection it must be borne in mind that *not a word was spoken* by the testatrix in all of the thirty or forty minutes consumed in the claimed execution of the paper. Yet, in view of the attitude and statements of the second witness, whose testimony constitutes the proponent's case, there is presented only one witness to the instrument, for Mrs. Zinsser *" doesn't remember seeing the name of testatrix and her mark "* upon the paper when she signed it. She testified in effect that testatrix did not declare the paper to be her last will and testament at the time of the signing of the paper. Her testimony in answer to the query whether testatrix desired her to be a witness to the paper brings in serious doubt, for while she admits that the question was put to the testatrix whether she desired Mrs. Zinsser to be a witness, her answers to questions respecting the pressure of her hand by testatrix are too uncertain and indefinite to bring any weight to proponent's essential proof, and on the contrary produces grave doubt as to this feature of the alleged execution. The question now arises whether her signing of the paper at the end and of the attestation clause, and her admission upon the witness stand that she signed in both places supplies for proponent what is lacking in her oral testimony. While we are not unmindful of the authorities which hold that under certain circumstances presumptions arise from the attestation clause which serve in lieu of a clear memory of the details of the execution of a paper on the part of the subscribing witnesses (*Matter of Kellum*, 52 N. Y. 517), such a rule may not be applied here. This witness was testifying to an instrument made only six months before. Her cross-examination did not disclose any ulterior motive for the difference between her testimony and the declarations of the attestation clause. Again there is the unusual situation presented where the testatrix, a victim of a paralytic

stroke, which came on an hour before, was *unable to talk*, and *unable to write*, and where all of the essentials of due execution depend upon the testamentary capacity of testatrix, her hearing, her understanding of the questions put by the attorney, and the accuracy with which she used the method of expression involved in the shaking of the head. The proof offered in behalf of proponent in his direct case is far from convincing as to the requirements of due execution and does not move the mind of the court by a fair preponderance of the evidence in his favor. The proponent has failed to sustain the burden of proof. As to the testamentary capacity of decedent there is the affirmative testimony of the attorney, that in his opinion she was of sound mind, negatived by the testimony of the other subscribing witness, that in her opinion she was not of sound mind. It is conceded that she suffered a paralytic stroke about an hour before and that she could not speak. Her only motions were the shaking of the head, the pressure of the hand, and other movements of the hands. The record is lacking almost entirely of any proof that she knew the nature and extent of her properties, the nature of the act she was performing, and the names and identities of those who would be the natural objects of her bounty and her relations to them. Therefore, the motion made at the close of the proponent's case by contestants is granted.

Although it is not necessary, in view of the above conclusions, it may be recorded here that disregarding the testimony of Mrs. E. S. Marmion, the trained nurse, and of John Schimp, the ambulance driver, for reasons already set forth, and of Dr. James L. Joughin, the expert in nervous disorders, for the reason that the hypothetical question addressed to him is not sufficiently comprehensive, the court's conclusion upon the whole case is the same as that upon the proponent's case. No additional weight was brought to proponent's proof offered on the direct case, while further strength was added to the contestants' position.

Probate of the propounded paper is accordingly denied. Submit decree upon notice.